IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| Christa Pantelides Clagett,<br>27 Southgate Ave.<br>Annapolis, MD 21401<br><br>    Plaintiff,<br><br> v.<br><br>The Boeing Company,<br>929 Long Bridge Drive<br>Arlington, VA 22202<br><br>    Defendants. | Civil Action No. |

**COMPLAINT FOR RELIEF FROM**
**RETALIATION IN EMPLOYMENT AND VIOLATION OF THE FMLA**

  1. Plaintiff Christa Pantelides Clagett complied with the instructions from her employer, The Boeing Company, to report any concerns regarding fraud, waste or abuse to internal investigators. Accepting the company's representation that this was a mandatory obligation on her part, and that the company would not retaliate against her for these disclosures, Plaintiff submitted concerns she genuinely harbored in good faith about the grossly wasteful and fraudulent practices of her boss, Executive Director, Ross Harvey, Boeing International Enterprise Services (BIES). She also discussed her concerns with Harvey. Boeing's internal investigators accepted her complaint, which was later validated by notification from the company that her boss had been counseled and that "corrective action" had been issued to address his actions.

  2. Prior to her protected disclosures, Boeing repeatedly acknowledged that Pantelides Clagett was an outstanding performer and she consistently earned highly-

complimentary performance appraisals. Similarly, Boeing invested in her future by accepting her into an accelerated executive development program, reserved for high-performers and those destined for senior executive ranks within the company.

3. Harvey knew of Plaintiff's protected activity and berated her for it. At his first opportunity following her disclosures to the internal investigators, he issued a far more critical performance appraisal than she had ever previously received, and then terminated her employment through a claimed reorganization and abolishment of her job.

4. These actions were retaliatory and designed to punish Pantelides Clagett for her protected disclosures. Boeing's putative explanations for abolishing her job are merely a pretext for reprisal. Plaintiff seeks relief from the injuries this retaliatory firing has caused, pursuant to the whistleblower protection provisions of the False Claims Act, the Sarbanes Oxley Act, and under Virginia common law. Similarly, Ross Harvey made the decision to fire Plaintiff while she was on approved Family Medical Leave following the birth of her first child. Her enjoyment of that leave was a factor in Harvey's decision to abolish her job and terminate her employment.

## JURISDICTION AND VENUE

5. This is an action brought under the anti-retaliation provisions of the False Claims Act, the Sarbanes Oxley Act, the Family Medical Leave Act and the common law of Virginia. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), 31 U.S.C. § 3730(h) and 18 U.S.C. 1514A. Venue is proper in this District under 28 U.S.C. § 1391(b), because Plaintiff was employed in, and the retaliatory and unlawful employment actions challenged in this Complaint took place in, this District.

**Parties**

6. Plaintiff Christa Pantelides Clagett is a resident of the State of Maryland who was employed by defendant in the Commonwealth of Virginia, until her unlawful discharge in Virginia.

7. Defendant The Boeing Company ("Boeing") was Plaintiff's employer, and is a for-profit corporation that conducts business and maintains offices in Virginia. Defendant is a federal contractor which sells goods and services to agencies of the United States government.

**FACTS**

8. Boeing hired Christa Pantelides Clagett in January 2013 as a Program Execution Specialist, Level 5.

*Plaintiff's Superior Performance and Bright Prospects Before her Protected Disclosures*

9. Pantelides Clagett excelled in this position, and in each of the progressively higher-level roles she performed for Boeing, earning highly successful performance appraisals, promotions, raises and bonuses under several different supervisors. For example, when serving as a Program Management Spec 5, early in her Boeing career in 2014, her then-supervisor, Christopher Wade Brenner, raved that "Christa has performed exceedingly well in every role she has taken on throughout the year with strong positive impacts across multiple programs and business units. She brings value to the business with expansive strategies, innovative capture approaches and strong program management." "Christa has a unique combination of skills not typically found in one person." In 2015, a new supervisor Patricia Alexander, rated her performance as Exceeding Expectations, and observed that "She is more proactive in an environment that has been traditionally reactive and this has been a very welcome change to IBS

and the IBS leadership team." In 2016, Kimberly Hild attested that "[a]ll customers supported are impressed and delighted with Christa's performance - her business acumen is of high caliber as well as her 'working together' skills which enables her to lead and influence successfully." This resulted in an overall Exemplary appraisal. In 2017, Susanna Murray declared emphatically that "This has been a great year for Christa" and that she had selected her for a new leadership role moving forward in Boeing International.

10.     Based on her talent, dedication and sustained superior performance, Boeing selected Pantelides Clagett to participate in the Leadership Development Executive Program Class of 2018, which Boeing touted as "an intentional, accelerated development journey resulting in a pipeline of emerging leaders with the required attributes and personal accountability to take The Boeing Company into the future!" Likewise, Boeing tapped her to participate in the Boeing Leadership Exchange in the spring of 2018, a program which the company described as having been "designed for the highest performing and highest potential employees."

11.     By 2018 Pantelides Clagett had a new supervisor, Director of Boeing International Enterprise Services, Ross Harvey. As with all of her previous supervisors, Harvey was impressed with Pantelides Clagett's dedication to the job and the quality of her performance, and acknowledged this in her year-end performance appraisal: "Christa has made an amazing contribution to the Boeing company this year," and "I want to pass on my personal thanks for all of her hard work, leadership & diligence in a job well done, thank-you & congratulations." Based on her exceptional performance and following the issuance of this appraisal, Harvey promoted Pantelides Clagett from an L level Manager to an M level Manager. Prior to her

engaging in protected activity under the law, his interactions with her were uniformly positive, and he treated her in a respectful and even friendly manner.

### *Ross Harvey's Fraudulent/Unethical Conduct*

12. Ross Harvey is British, and his family resides in England. Under Boeing's "EXPAT" policies, Harvey certified that he would spend the majority of his working days in the United States, at the headquarters for Boeing International in Arlington, Virginia. Indeed, Harvey entered into a contractual EXPAT relationship with Boeing between June 2018 and February 2020 based on this expectation. By making this certification, Harvey qualified for generous EXPAT benefits worth, upon information and belief, tens of thousands of dollars, outlined in the Boeing Long Term Assignment Flex Benefit Addendum, including Boeing paying for an expensive three bedroom apartment in the D.C. area, in which he (and at times his family) were to reside.

13. This EXPAT status was a fiction. Far from spending the majority of his time in the D.C. area, Harvey at best typically spent no more than three working days a month here, and often far fewer. Similarly, his family was rarely in Virginia (or even the United States), begging the question why he was being provided with a large, three-bedroom residence for which he paid nothing.

14. Harvey's misleading EXPAT claim also resulted in the need for far more extensive travel, usually in the form of airline trips. Contrary to Boeing policy, Harvey typically traveled in business or first class accommodations, and made frequent last minute changes to his travel plans, resulting in much higher costs. Harvey's Office Assistant reported concerns to Pantelides Clagett and others about Harvey's lavish travel habits, and Harvey himself bragged openly about them, apparently believing himself to be immune to charges of transgressions

5

relating to fiscal responsibility because of his close association with Sir Michael Arthur and who had just recently been elevated to President, of Boeing International.

15. Harvey submitted false and fraudulent documentation in pursuit of these EXPAT benefits through both the mail and email systems, and he used those systems as well as the telephones to further his fraudulent conduct and to conceal it. Accordingly, Harvey's conduct implicated potential violations of 18 U.S.C. § 1341 and/or 18 U.S.C. §1343.

16. Harvey's ethical flexibility not only benefitted himself and his family, but also a subordinate, Forest Harger, who seemed to enjoy a close personal relationship with him. Harger had been a short-tenured Office Administrator (OA) when Harvey came on board. But shortly thereafter, he promoted her without competition to a Staff Analyst position (a job for which others with longer tenure, and better credentials, were denied the opportunity to compete). Once promoted, he then assigned Harger a role to function as his Chief of Staff, vesting her with even greater informal authority over others within the office. In the early summer 2019, Harvey accommodated Harger again by allowing her to work as a virtual employee 100% of the time, from a remote location in Vermont. Boeing had no office in Vermont, and no business need for an employee to be located there. No other employees were offered this accommodation; indeed, other staff who had previously requested the opportunity to work in a full-time virtual role, had been denied it.

17. There was no business justification for establishing Harger as a remote employee in Vermont. Harvey allowed this merely as a favor to Harger, but it resulted in substantial additional expense because she frequently would travel back to the D.C. area to be there in person during the few days per month that Harvey might actually be at headquarters. Moreover, she, like Harvey, traveled in lavish fashion, bragging that she was permitted to fly in business

6

class and living at the Ritz Carlton hotel when she returned to Arlington. Harger also was permitted to travel in luxury when attending other meetings. In one instance, Harger admitted in an email to Pantelides Clagett that Boeing had paid $3000 for her to travel in business class. In contrast, Harvey had denied Pantelides Clagett the opportunity to fly in business class even when she was pregnant, admonishing her that the travel budget could only support economy fares.

18. Harvey not only bestowed this favored treatment on Harger, but they conspired to conceal it by staging her work space in Arlington to make it appear as if she was regularly working there (when in fact she was not), and by having her emails and business phone indicate that she was working from Boeing International Headquarters, in Arlington. Harger again admitted that these steps were taken to conceal the facts, and avoid "drama" from "legal and HR."

19. Harvey and Harger used the mail, email and telephone systems to fraudulently pursue these benefits for her, and to conceal the fact of their scheme. Accordingly, Harvey's and/or Harger's conduct implicated potential violations of 18 U.S.C. § 1341 and/or 18 U.S.C. §1343.

20. Upon information and belief, Harvey's and Harger's fraudulent scheme resulted in tens of thousands of dollars (or more) of waste and unnecessary expense. Some or all of the costs of Harvey's and Harger's fraudulent conduct was passed on by Boeing to the U.S. government and taxpayers, as part of the cost-plus reimbursement arrangement Boeing had with its federal clients. Plaintiff was informed by Boeing officials that some costs of this nature were ultimately borne by the federal government. Moreover, to the extent that any or all of the costs of Harvey and Harger's schemes were not passed-on to the U.S. government and taxpayers, they were borne by the Boeing shareholders.

21. In the fall of 2019, Pantelides Clagett was planning to post a vacancy for a new Project Management position in Bristol, England. In October, Harvey began trying to persuade her to change her plans, and to create a new role for Harger which would result in yet another promotion for her without competition. Harvey appeared to be preparing for his repatriation back to the UK, which would leave Harger without justification for continuing in her role as Chief of Staff in the U.S. Harger then revealed that she had had private discussions with Harvey about a new role, that she did not have the experience in Project Management for the position Pantelides Clagett was about to post (which was not public knowledge, and which Harger should not have seen and was not well suited for in any event), and that Harvey had assured her that they would use that slot to afford her something else. Pantelides Clagett reasonably believed that this plan to give a job to Harger for which she was not qualified was done simply as a favor to Harger and not to further Boeing's business interests or those of Boeing's clients. This action also would also have imposed tens of thousands of dollars of unnecessary expense per year upon the government and/or Boeing's shareholders.

### *Plaintiff's Protected Disclosures to Harvey*

22. Harvey continued to lobby Pantelides Clagett to find a way to take care of Harger and provide her with a new job, at the expense of her plan to post the Project Management position in Bristol. These discussions came to a head during a meeting on November 20, 2019 in which Harvey reiterated his interest in accommodating Harger. After that meeting, Pantelides Clagett sent Harvey a plan with three options for a new position on her team, but noted that "It unfortunately does not solve the problem with creating a new role for Forest beyond the one I shared initially." Harvey acknowledged receipt, but indicated that he was not satisfied with this response. The next day, in a reply email, Pantelides Clagett noted:

> I am trying to help, but also meet the needs of my team as well.  With regard to the Bristol req, this never was an issue until you wanted to re-purpose this for Forest which I have to be honest – I don't find to be right or a fair approach.  This has been my plan since June, you have approved this approach in numerous 1:1s. … We can chat further in our meeting in a few.  But I'm not sure why all of the attention is circulating around this Bristol req because of a single person, the business need to post that req and SoW have not changed.

23. This communication was protected activity under both the False Claims Act and the Sarbanes Oxley Act, as it was opposing Harvey's wasteful and fraudulent scheme to create an unnecessary job for his friend, Forest Harger to the detriment of the needs of the team, their clients and the business.  When Ross Harvey read this reply, he became enraged and called Pantelides Clagett, yelling at her that she had supposedly made a "false allegation" against him in writing.  He also made an extremely threatening comment that she was "on the wrong end of the stick," and warned her to "never to put anything like that in a written record again."

### *Plaintiff's Protected Disclosures to the Boeing Ethics Office*

24. Pantelides Clagett had a genuine, reasonable and good faith belief that Harvey's and Harger's conduct was wasteful, fraudulent and violated Boeing's ethical policies, which (as described in ¶ 34 below) mandated reporting.  Accordingly, she disclosed her concerns to the Boeing ethics office.

25. Pantelides Clagett's first disclosures to Boeing's ethics officials regarding Ross Harvey's conduct actually began two days *before* his infuriated response to her email.  On November 19, 2019, Pantelides Clagett contacted Boeing's ethics office and made an initial report about her concerns regarding Harvey and Harger.  She verbally described the situation, but did not at that point submit a written report.

26. On December 6, 2019, Pantelides Clagett met again with Corporate Investigator Page Germain and described in detail her concerns.  On December 18, 2019, she signed a written

statement prepared by the Boeing ethics office, following an interview, and attesting that the facts she recounted were "true and accurate to the best of my knowledge." In her statement, Pantelides Clagett reported on each of the issues identified above.

- Regarding Harvey's EXPAT status she reported: "Harvey is an EXPAT, travels extensively and is currently based in Arlington, VA. He works one week in Virginia and three weeks on travel throughout the world."

- Regarding his original promotion of Harger, she disclosed: "Sometime in November or December 2018 Forest Harger told me that Harger told Harvey that she (Harger) was interested in a Chief of Staff position. Harger was an Executive Office Administrator in Arlington, VA at the time. Within a few weeks (sometime in December 2018); Harger told me that she would essentially be selected for the Chief of Staff position without having to post/compete for the job. . . . In December 2018, there were five (5) Office Administrators working in Arlington, VA. Most of them had more tenure than Harger and it is likely that all 5 of these OA's would have liked to have the opportunity to post for the Chief of Staff position."

- Regarding Harvey's accommodation of Harger in a full-time virtual role in Vermont, she described: "In July or August 2019, Harger told me that her husband accepted a position in Vermont and Harger asked me if Boeing had a work location in Vermont. There is no Boeing work location in Vermont. Later, Harger told me there was too much red tape involved in establishing a Vermont office just for her. However, Harvey approved Harger to be a 100% virtual employee and would allow her to work from Vermont. . . . [I]n the past, other chiefs of staff and other managers had asked to work virtually full time and were denied that opportunity. . . . Finally, Harvey was not transparent with his own team about allowing Harger to work virtually full time from Vermont. Harger shared that Ross told her to leave her desk the way it is so others do not ask or are tempted to inquire where she is. Harger agreed and mentioned that there was no need for others to know of her arrangement. . . . Lastly, her signature block and Workday information still note Arlington as her location, phone, etc."

- Regarding "allegations that Ross Harvey and Forest Harger are not following Boeing travel policy and that Harvey is allowing Harger to deviate from Organization specific cost savings requirements" Pantelides Clagett told the ethics office: "Harger told me that Harvey would be paying for Harger to travel from Vermont to Arlington, VA to provide Chief of Staff support during the times Harvey was in the Arlington, VA Office. On December 2, 2019, Harger told me that she was staying in the Ritz Carlton." Ms. Pantelides Clagett further described how on a trip to London, Harvey had insisted that she travel in economy class, but allowed Harger to travel first class. "Harvey made a comment to the effect that someone had been upgraded to a first class flight to London. Then Harger told the team that she had flown first class." She summarized, "[a]fter observing Harvey promoting Harger, then allowing Harger to be a full time virtual employee, and then apparently reimbursing Harger to travel to her base work location –

- Arlington, Virginia; and then apparently authorizing Harger to fly business class: I began to conclude that Harvey unfairly favors Harger over his other direct reports."

- Finally, regarding Harvey's most recent effort to again promote Harger without competition by repurposing a personnel slot intended for a Business Operations position, she reported that Harvey told her "that he wanted to 'take care of' Harger and wanted to reward her for her 'outstanding performance.' Harvey then asked me to review my open WAMW-4 position to see if I could modify it to be a US based position. He suggested that Harger could perform this level 4 position. I responded to Harvey's suggestion that I modify the job to fit Harger by telling him that Harger was not qualified to be a level 4. I also told him that candidates that are better qualified than Harger would apply for the position. . . . Harvey was persistent and said that Harger was a good fit for WAMW job. I told Harvey I wasn't comfortable with re purposing my requisition and not posting the job. . .. Harvey and I had at least four verbal conversations about my requisition and placing Harger in my open position. As Harvey talked, our working relationship degraded." Plaintiff then described her email exchange with Harvey on November 20 and 21, 2019 and his irate response, including his warning to "never to put anything like that in a 'written record' again."

### *Ross Harvey Retaliates*

27. Harvey knew, based upon the content of the allegations made to the ethics officials, and based upon his receipt and extremely negative reaction to her November 21, 2019 email regarding one of these topics, that Pantelides Clagett was a source of the ethics report against him.

28. Harvey's attitude toward Pantelides Clagett changed markedly after her protected activity as described in ¶¶'s 22-26. He immediately began questioning her about the status of assignments she had already completed, and treated her in a cold and confrontational fashion (completely unlike the manner in which he had treated her prior to her protected disclosures). Indeed, his shift in attitude was so apparent that colleagues asked Pantelides Clagett why Harvey was so angry with her. Then, just a few weeks after the November 21 email exchange, he issued her an unfairly low "Met" (average) performance rating, with critical comments unlike anything any manager (including him) had ever written in her prior appraisals, which as noted above had all been extremely positive and filled with praise. Pantelides Clagett noted in her response to the

appraisal that "Some of the comments provided in my summary are external to my work statement and were only shared with me at the time of this review and were a first heard."

29. On February 12, 2020 Boeing notified Pantelides Clagett that Harvey and Harger had been issued corrective action over their conduct: "taking into account all of the facts and data specific to this particular situation, the respondents Ross Harvey received coaching/counseling and (Forest) Harger received verbal warning as corrective action." Because Harvey had been investigated and reprimanded for the wrongful conduct that Pantelides Clagett had reported, he had an even greater motivation to retaliate against her.

30. Pantelides Clagett was pregnant when this pronouncement was issued, and soon thereafter she went on maternity leave. While she was out on that approved leave under the FMLA, Harvey retaliated against her by deciding to eliminate her position and terminate her employment with Boeing. Harvey never even spoke with Pantelides Clagett (one of his key subordinate managers) about his decision; Human Resources notified her of this decision on July 17, 2020. Boeing has admitted in a February 2021 filing with the U.S. Department of Labor that Harvey decided to abolish Plaintiff's job, and to include her on a layoff list during "the spring of 2020" (i.e., very soon after her protected activity and after the counseling and reprimand of Harvey).

31. Plaintiff was the only senior leader in his group who lost her job as a result of this reorganization. Harvey did not abolish the job of another senior leader who reported to him, and who had volunteered for early retirement. Had Harvey truly been interested in cost-savings and/or streamlining his management team, he would have abolished the position of this other manager. Moreover, Pantelides Clagett had all the qualifications and experience needed to

perform in that role. Instead, Harvey abolished Plaintiff's position, and terminated her employment to punish her for her protected activity.

32. The decisions to abolish Plaintiff's job, and to terminate her employment, were in reprisal for her protected disclosures to the Boeing ethics office, and for her protected activity opposing Harvey's scheme made directly to him. These actions were wanton, willful and taken with actual malice, or at a minimum were taken in reckless disregard of Plaintiff's rights to be free from reprisal under the law.

33. Defendant's actions caused Plaintiff severe financial and emotional harm. Moreover, they were taken at a time when she was especially vulnerable to significant emotional distress, as she was on approved maternity leave.

### *Boeing's Policies Compelling Ethics Reports*

34. Boeing published employment policies which created a mandatory obligation on employees to report concerns about ethics and/or fraud they observe at the workplace, and which clearly promised that employees would *not* suffer any form of retaliation for doing so. More specifically, Boeing's Code of Conduct provided:

> **Anti-Retaliation**
>
> An environment where employees feel comfortable speaking up and raising issues without fear of retaliation is vital to maintaining our culture of openness and accountability. A trusting and respectful workplace that is free from retribution is foundational to business performance. Further, as the Boeing Code of Conduct states, ***"Retaliation against any employee who comes forward to raise a genuine concern will not be tolerated."***
>
> ***Each employee is personally accountable and empowered to make the best decisions for our stakeholders. Employees must raise issues, express concerns, or report suspected violations directly to any manager or use the Ethics Reporting Process to contact an Ethics Advisor or the Ethics Line.*** *When appropriate, employees may report confidentially or anonymously, or through the Sarbanes-Oxley Reporting Tool.* ***Boeing does not tolerate retaliation against employees who come forward to raise issues or concerns.*** *Violations of Boeing policies or procedures, regulations, contractual*

*requirements, or ordinary, reasonable common-sense rules of conduct may have serious consequences, for both Boeing and the individuals involved. We train all managers to comply with applicable laws, regulations, and standards and to oversee and respond appropriately to ethical issues.* (emphasis supplied).

35. Christa Pantelides Clagett relied upon and complied with this provision in deciding to report her concerns about her boss Ross Harvey to the Boeing ethics investigators.

36. Boeing's policies created a clear and unambiguous obligation not to retaliate against Pantelides Clagett for her protected disclosures; this promise amounted to an implied contract which Boeing breached by, among other things, terminating her employment in reprisal for her protected disclosures.

37. Boeing's breach of the implied contract caused Pantelides Clagett severe financial harm.

### *FMLA Violation*

38. Ross Harvey made the decision to abolish Pantelides Clagett's position while she was on approved maternity leave.

39. Her enjoyment of that leave was one of the motivating factors in his decision to abolish her job. As described in ¶ 31 above, Harvey ignored the fact that another similarly situated manager had volunteered for early retirement, which would have allowed him to accomplish any cost-savings or early retirement goals without terminating Plaintiff's employment. Instead, he insisted on abolishing her job, and terminating her employment.

40. This action was not taken in good faith.

### *Impact of the Unlawful Firing on Plaintiff's Career Progression*

41. Absent Defendant's unlawful conduct, Pantelides Clagett would have remained with Boeing, and would have received promotions into Boeing's executive ranks which would

have dramatically increased the salary, bonuses, equity awards and other compensation for employment that she would have enjoyed.

42. Upon information and belief, other similarly situated employees who had been accepted into the 2018 Leadership Development Executive Program and/or the Boeing Leadership Exchange program, but who have not been retaliated against for having engaged in statutorily protected activity, have received such promotions.

### *Exhaustion of Administrative Remedies*

43. Plaintiff exhausted required administrative remedies on her Sarbanes Oxley retaliation claim by timely filing a complaint with the U.S. Department of Labor. That complaint is still pending and has been pending for more than 180 days.

### COUNT ONE

### (RETALIATION IN VIOLATION OF THE FALSE CLAIMS ACT)

44. Paragraphs 1-43 are realleged.

45. Plaintiff engaged in protected activity under the Federal False Claims Act by taking steps to investigate, oppose and report reasonable and genuinely held concerns about fraudulent conduct by her boss and a colleague. The fraudulent scheme resulted in substantial costs being borne by the federal government and taxpayers.

46. Defendant abolished her job and terminated Plaintiff's employment because of her protected activity in violation of the anti-retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3730(h).

47. Defendant's conduct has caused Plaintiff grievous financial harm, precluded her from obtaining promotion into the Boeing executive ranks, and caused her substantial emotional distress and loss of enjoyment of life.

## COUNT TWO

### (RETALIATION IN VIOLATION OF THE SARBANES OXLEY ACT)

48.     Paragraphs 1-43 are realleged.

49.     Plaintiff engaged in protected activity under the Sarbanes Oxley Act by taking steps to investigate, oppose and report reasonable and genuinely held concerns about fraudulent conduct by her boss and a colleague.  The fraudulent scheme resulted in substantial costs being borne by the Boeing shareholders, and was accomplished and/or concealed by use of the mail, email and telephone systems.  These disclosures raised potential violations of 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C.A. § 1514A.

50.     Defendant abolished her job and terminated Plaintiff's employment because of her protected activity in violation of the anti-retaliation provisions of the Sarbanes Oxley Act.

51.     Defendant's conduct has caused Plaintiff grievous financial harm, precluded her from obtaining promotion into the Boeing executive ranks, and caused her substantial emotional distress and loss of enjoyment of life.

## COUNT THREE

### (BREACH OF CONTRACT And/or DETRIMENTAL RELIANCE)

52.     Paragraphs 1-43 are realleged.

53.     Boeing breached an implied contract whereby it promised not to retaliate against Plaintiff for her having complied with its mandatory reporting obligation regarding potential fraudulent or otherwise unethical conduct.

54.     Plaintiff relied upon Defendant's unambiguous promise of non-retaliation to her detriment and suffered grievous financial harm as a result of Defendant's breach.

## COUNT FOUR

### (VIOLATION OF FMLA)

55.     Paragraphs 1-43 are realleged.

56.     Defendant also fired Plaintiff because of her protected FMLA leave.

57.     Defendant's violation of the FMLA was willful, and not taken in good faith.

### RELIEF

Plaintiff requests that this Court award the following:

1. Order that Defendant reinstate Plaintiff to her position and promote her to the level that she would have occupied at the time of judgment in her favor, absent any retaliation; alternatively, order that Defendant be required to provide complete make-whole relief for all future pecuniary loss (front pay) resulting from the unlawful termination of her employment.

2. Award Plaintiff, retroactive to the date of her unlawful discharge, all back pay, benefits, bonuses, awards, and other compensation, benefits or privileges of employment that she would have received in her then-current position, and in any promotion she would have received, absent any retaliation;

3. Compensatory damages, in an amount to be proven at trial, for the pain, suffering, emotional distress, inconvenience, damage to career, past and future pecuniary loss, and loss of enjoyment of life that Plaintiff has experienced, and will in the future experience, as a result of Defendant's unlawful conduct;

4. Liquidated damages, as provided by the FMLA;

5. Punitive damages in an amount determined by the jury for defendant's malicious violation of the law;

6. Prejudgment interest on all sums awarded herein;

7. Plaintiff's costs, expenses, attorney's fees, and expert witness fees incurred in connection with this action;

8. Declaratory and injunctive relief that Defendant has violated Plaintiff's rights and enjoining Defendant from further violations of Plaintiff's rights;

9. Such other relief as the Court deems just.

## JURY DEMAND

Plaintiff requests trial by jury as to all issues in this case.

_____/s/_____
Sharon Rogart, VA Bar #93734
Richard A. Salzman*
(*Pro hac vice application forthcoming*)
HELLER, HURON, CHERTKOF & SALZMAN
1010 Wayne Ave., Suite 510
Silver Spring, MD 20910
(202) 293-8090
Fax: (202) 293-7110
str@hellerhuron.com
ras@hellerhuron.com

Attorneys for Plaintiff